UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARILYN MABINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 16 C 10261 |
| | ) |
| AEP NVH OPCO, LLC, d/b/a APPLIED ACOUSTICS INTERNATIONAL, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marilyn Mabins alleges that her former employer, Defendant AEP NVH OPCO, LLC (hereafter "AEP"), violated the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654, when it fired her in early 2016. Defendant claims that Plaintiff did not provide the requisite notice of her eligibility for FMLA leave. The parties have filed cross motions for summary judgment, and a previously dismissed party (UGN, Inc.) has filed a motion for sanctions. Because genuine disputes remain as to whether Plaintiff provided sufficient notice of her eligibility for FMLA leave, both motions for summary judgment are denied. UGN's motion for sanctions is denied as well, because Plaintiff's now-withdrawn claims against UGN were not frivolous, and because there is no evidence that Plaintiff named UGN as a defendant for an improper purpose.

## BACKGROUND

Marilyn Mabins has had a close relationship with her grandmother for her entire life. Marilyn and her mother lived with Marilyn's grandmother in Chicago until Marilyn was in the fifth grade. (Pl.'s Statement of Material Facts (hereafter "PSOF") [73], at ¶ 12; Dep. of Marilyn Mabins (hereafter "Mabins Dep.") 42-43, Ex. A to Def.'s Statement of Undisputed Material Facts (hereafter "DSOF") [69].) Marilyn and her mother then moved to Carbondale, Illinois, so her mother could attend college. (Mabins Dep. 42-43.) Marilyn returned to Chicago when she reached the ninth grade, and lived exclusively with her grandmother from that point on. (*Id.*; PSOF ¶ 14.)

In August 2014, Marilyn began working for the auto-parts manufacturer UGN, Inc. (DSOF ¶ 3.) She obtained her initial position at UGN through a staffing company, and on June 8, 2015, UGN hired Mabins to work full-time on its assembly line. (*Id.* at ¶ 4-5.) Defendant AEP acquired UGN in February 2016. (*Id.* at ¶ 6.) At that point, Mabins became an employee of AEP. (*Id.*)

Mabins received a copy of UGN's attendance policy as part of her employment for that company. (*Id.* at ¶ 7.) When AEP acquired UGN, AEP adopted UGN's attendance policy as its own. (*Id.*) The policy requires employees to give at least 30 minutes' notice if they will be late for, or will be unable to work, a shift. (*Id.* at ¶ 8.) This policy also states that "Team Members who are absent for three (3) consecutive working days without calling into the call-off line and leaving a message ('No Call/No-show') will be considered to have voluntarily terminated their employment." (*Id.* at ¶ 9.) The company's bereavement policy allows employees to take up to three days of paid leave following the death of a "direct relative," including a grandparent—so long as the employee provides "proof of the relationship and proof of death to the Human Resources Team." (*Id.* at ¶ 10; Bereavement Policy, Ex. B to Aff. of Tina Durr (hereafter "Durr Aff."), Ex. E to DSOF.) The bereavement policy also allows employees to take an additional two days of unpaid leave if the deceased relative's funeral is held more than 200 miles from the employee's residence. (*Id.*) In "[r]are [c]ircumstances," the policy continues, "an unpaid extension of bereavement leave for immediate family may be granted for up to 5 additional working days." (Bereavement Policy.)[1] Defendant contends, and its Director of Human Resources has testified, that it "routinely grants employees' FMLA leave requests." (Durr Aff. ¶ 16.)

On February 10, 2016, Marilyn Mabins called Defendant's Human Resources Department to request leave through February 20. (DSOF ¶ 14.) Mabins has testified that she spoke with a woman named Jennifer during this call, and that she told Jennifer the leave was

---

[1] The term "immediate family" is not defined in the excerpt that appears in the record.

related to the death of her grandfather. (Mabins Dep. 52, 54.) In fact, Mabins' grandfather died approximately twenty years earlier. (*Id.* at 25-26.) Mabins planned to use the time off to accompany her grandmother, who suffers from dementia, on a trip to Atlanta, Georgia, so that her grandmother could spend time with Mabins' ailing great-uncle. (*Id.* at 52-53.) Mabins admits that she did not tell Jennifer any of this on February 10. (*Id.* at 54.) Instead, she invented a story about her grandfather's funeral because she "was trying to figure out a way to get off work" and didn't think that Defendant would grant her leave for "my grandmother's brother." (*Id.* at 25.)[2] Jennifer—who Defendant identifies as Human Resources Generalist Jennifer Hoernig—approved Mabins' request for leave and requested that she provide an obituary when she returned to work. (DSOF ¶ 15; Mabins Dep. 55-56.)[3]

On February 21, Mabins left a voicemail with Defendant's answering service. (DSOF ¶ 19.) In this voicemail, Mabins stated that she "was taking a leave of absence" because she was "tending to [her] grandmother." (Mabins Dep. 56-57.) Jennifer returned the call and told Mabins she had heard her message. Mabins told Jennifer that she 'would be in touch when [she] was coming back." (*Id.* at 58; DSOF ¶ 20.) Mabins did not say said anything else during this phone call. (Mabins Dep. 58-61; DSOF ¶ 21.)[4]

---

[2] Mabins now denies that she referred to her grandfather during this call, citing an affidavit she completed several weeks after her deposition. (Pl.'s Resp. to DSOF [75], at ¶¶ 14-15; Aff. of Marilyn Mabins (hereafter "Mabins Aff."), at ¶ 5, Ex. 7 to Pl.'s Resp. to DSOF.) Plaintiff's affidavit is insufficient to create a genuine dispute of fact, because it directly contradicts her prior sworn deposition testimony and Plaintiff has offered no explanation for the contradiction. *See Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015) ("A 'sham affidavit' is an affidavit that is inadmissible because it contradicts the affiant's previous testimony . . . unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse.").

[3] Mabins denies that Hoernig requested an obituary (Pl.'s Resp. to DSOF ¶ 16), but Mabins herself testified that "Jennifer" requested an obituary, and that Mabins never provided one. (*See* Mabins Dep. 55-56.)

[4] Mabins denies that she did not say anything else during this call, but she does not identify anything else that she said. (Pl.'s Resp. to DSOF ¶ 21.) At her own deposition, Mabins was asked if she said anything else to Jennifer during this call, and she answered "no." (Mabins Dep. 58-59.)

3

On February 23, Maria Owens, Defendant's Human Resources/Safety Manager, sent an e-mail with the subject heading "Marilyn Mabins" to Jennifer Hoernig and Tina Durr, Defendant's Director of Human Resources. (DSOF ¶ 22; D000250, Ex. G to DSOF; Durr Aff. ¶ 3.) This e-mail states, in its entirety, "Did Marilyn request FMLA? Roy said she did." (D000250.)[5] Defendants claim, and Owens has testified, that Hoernig responded to this e-mail verbally, and that she told Owens "no, [Mabins] did not request." (Dep. of Maria Owens (hereafter "Owens Dep."), Ex. C to DSOF 69-70.) But Hoernig herself does not remember whether she responded to Owens' question (*see* Hoernig Dep. 21), and Owens' testimony about what Hoernig said is hearsay.[6]

On February 28, Owens called Mabins and asked her if she would be coming to work that night. (DSOF ¶ 24; Mabins Dep. 61-62.) Mabins said she was not coming to work that night, and that "I would let [Owens] know . . . [w]hen I was coming back." (DSOF ¶ 25; Mabins Dep. 61-62.) According to Mabins, neither she nor Owens said anything else during this phone call. (Mabins Dep. 62; DSOF ¶ 26.)[7]

On March 1, Owens sent an e-mail to Coordinator Paul Coppie and Roy Gonzalez (whose position the parties do not identify), again with the subject heading "Marilyn Mabins." (DSOF ¶ 27; D000252, Ex. D to DSOF.) This e-mail states, in its entirety, "We heard bereavement for the following dates. She was on bereavement 2/11-2/15 because her grandmother was out of town she would get 2/16, 2/17. I see 32 hours PTO for 2/16-2/19 I

---

[5] The parties have not identified "Roy," but the court presumes Owens is referring to Roy Gonzalez, an individual with whom Owens subsequently corresponded about Mabins. (*See* D000252, Ex. D to DSOF.)

[6] The statement is offered for its truth—i.e., that Mabins did not say anything that would have put Defendant on notice that Mabins likely had a right to leave pursuant to the FMLA. And although Mabins' statement to Hoernig might qualify as an opposing-party admission under FED. R. EVID. 801(d)(2), Hoernig's statement to Owens does not because it is offered *by* the declarant (or, rather, by the declarant's principal) rather than *against* the declarant.

[7] Plaintiff again purports to deny facts to which she herself testified at her deposition, and again offers no evidence suggesting that her prior testimony was inaccurate. (Pl.'s Resp. to DSOF ¶ 26; Mabins Dep. 61-62.)

guess as extended bereavement. I see in timesaver that Marilyn has requested a Leave do you know what type?" (D000252.) Gonzalez responded a few minutes later. "We don't know," his e-mail explains. "He[r] last message on call off voicemail was that she was going to request leave. Did she apply for one? I believe the message she had left was about 2 weeks ago. I also heard that she found another job .??" (*Id.*) Owens then copied Hoernig on her response to Gonzalez and Coppie, stating, "I am waiting on a return call from her now. I will let you know what I found out." (*Id.*)

According to Defendant, Owens mailed a letter to Mabins on March 2. (DSOF ¶ 29.) This letter was addressed to the P.O. Box associated with Mabins in Defendant's files, where Defendant also "sends her W2." (Durr Aff. ¶¶ 5-7.) The letter states, *inter alia*,

> You requested bereavement leave due to the death of your grandfather that lived out of town more than 200 miles away. You were granted the (3) days paid bereavement and the 2 days unpaid to travel out of town. You then called and requested additional leave time which was paid out as 4 days PTO. You were scheduled to return to work on Sunday, February 22, 2016 @ 11pm. However, to date you have not called or shown for work since February 16, 2016. On Sunday, February 28, I called you . . . and you told me that you were trying to see what they were going to do regarding your grandfather. I called and left you a message to kindly return my call on Monday, February 29, and Tuesday, March 1, 2016, but I haven't heard from you since my call on Sunday.

(D000160, Ex. D to DSOF.) This letter concluded with a warning that Defendant would terminate Mabins' employment if she did not provide, by March 9, 2016, "documentation for bereavement as well as other documents that supports why you seem to have been unable to call or show for work since February 22, 2016." (*Id.*) Plaintiff claims that she never received this letter. (Pl.'s Resp. to DSOF ¶ 29-30; Mabins Dep. 62.)

On the same day that Owens recalls having mailed this letter to Mabins, Jennifer Hoernig sent an e-mail to Amanda Rivera, a customer services representative for a company that appears to have provided Defendant with uniforms for its employees. (DSOF ¶ 31.) In this e-mail, Hoernig asks Rivera to "please let Mike know that we have a uniform cancellation for [redacted] and can we put FMLA team members uniforms on hold. We have Marilyn Mabins

and [redacted] out on FMLA for over a month." (D000260, Ex. G to DSOF.) Rivera's response states that she "went ahead and put Marilyn and [redacted] on a 90 day hold." (*Id.*)

According to Defendant, "Hoernig did not believe Plaintiff was out on FMLA" when she sent this e-mail. (DSOF ¶ 32.) Rather, she "intended to convey that the other employee was out on FMLA whereas Plaintiff was just out." (*Id.* at ¶ 33.) At her deposition, Hoernig described the meaning she intended to convey as follows: "[w]e have Marilyn Mabins and whoever else was out on FMLA for over a month. So that second person, whoever that was that I don't recall, was out for over a month. So Marilyn Mabins was out and that person's name was out on FMLA for over a month." (Hoernig Dep. 52.) Mabins disputes all of this. She contends that the e-mail demonstrates that Defendant either granted her what she refers to as "FMLA leave," or else believed that she was exercising the rights protected by FMLA at the time the e-mail was sent. (PSOF ¶ 23.)

On March 7, Mabins called Owens "to see about coming back to work." (Mabins Dep. 62; DSOF ¶ 34.) Owens "told [Mabins] to hold on." (Mabins Dep. 63.) Owens subsequently "came back to the phone" and told Mabins that she "was fired for no-call, no-show the 27th, 28th, and 29th of February." (*Id.*) The record is not clear as to precisely who made the decision to terminate Plaintiff's employment or when that decision was made. If the decision was made before Mabins's phone call, Defendant has not explained why it waited until Mabins called to communicate the decision, nor why it was made prior to March 9, the date by which Mabins was directed in Owens's letter to provide documentation for her absence from work.

Mabins contends that, regardless of when the decision was made, Defendant "was aware of Plaintiff's relationship with her grandmother through Owens." (Pl.'s Statement of Add'l Material Facts (hereafter "PSAMF") [76], at ¶ 29.) But Defendant disputes this, and the evidence Mabins cites establishes only that she told Owens about her grandmother's illness, not that she explained the nature of her relationship with her grandmother. Mabins testified that Owens gave her a ride home one night after work, in January 2016, and that during the drive,

Mabins told Owens "about my grandmother being sick, and that she wanted to visit her brother." (Mabins Dep. 84.) Mabins was asked at her deposition whether she told Owens anything else about her grandmother, and Mabins responded "[j]ust that she wanted to see her brother." (*Id.* at 85.) Mabins was also asked whether she "ever [told] anyone at [Defendant] that your grandmother was like a mother to you." (Mabins Dep. 63.) Mabins responded "At [Defendant], no." (*Id.*)

Mabins filed this action on November 1, 2016, alleging that both UGN and AEP unlawfully interfered with her right under FMLA to take leave to care for her grandmother. (Compl. [1], at ¶¶ 30-47.) Mabins also alleged that both companies unlawfully retaliated against her for engaging in protected conduct. (*Id.* at ¶¶ 48-71.) She acknowledged that AEP acquired UGN "in approximately February 2016," but nevertheless named both UGN and AEP as Defendants. (*Id.* at ¶ 14.)

On December 14, 2016, counsel for UGN served Plaintiff's counsel with a letter asserting that, because AEP had acquired UGN on February 3, 2016, Mabins' claims against UGN had "absolutely no legal or factual basis." (Letter of Dec. 14, 2016, Ex. 4 to UGN's Mem. in Supp. of Mot. for Sanctions (hereafter "Sanctions Mot.") [44].) On December 15, 2016, Plaintiff's counsel responded that they were "in no position to accurately determine the identity of the proper defendant in this case," because UGN had refused Plaintiff's request for a copy of the acquisition agreement between UGN and AEP. (Letter of Dec. 15, 2016, Ex. 5 to Sanctions Mot.) Plaintiff then filed a motion to compel the production of documents related to AEP's acquisition of UGN, which this court denied on January 5, 2017; Plaintiff did not need to review the sale agreement in order to confirm that AEP is the party, if any, liable for violating her rights. (*See* Minute Entry of Jan. 5, 2017 [21].) UGN filed a motion to dismiss the following day, and Plaintiff agreed to voluntarily dismiss all her claims against UGN on January 12. (*See* Pl.'s Mot. to Dismiss [29].) UGN subsequently filed a Rule 11 motion for sanctions [43], and Mabins and

AEP filed cross-motions for summary judgment [67, 71]. All three motions are now before the court.

## DISCUSSION

**I.       Cross-motions for summary judgment on FMLA claim**

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party's burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "When presented with cross-motions for summary judgment, the court is required to adopt a 'Janus-like perspective,' viewing the facts for purposes of each motion through the lens most favorable to the non-moving party." *Moore v. Watson*, 738 F. Supp. 2d 817, 827 (N.D. Ill. 2010) (Gottschall, J.) (quoting *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992) (Shadur, J.), *aff'd*, 9 F.3d 1198 (7th Cir. 1993)).

The Family Medical Leave Act provides eligible employees with the right to take "a total of 12 workweeks of leave during any 12-month period . . . in order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The statute defines "parent" as "the biological parent of an employee or an individual who stood in loco parentis to an employee when the employee was" either (a) under 18 years of age, or (b) "incapable of self-care because of a mental or physical disability." *Id.* at §§ 2611(7), (12). According to regulations promulgated by the Department of Labor, "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave," though "[w]hen an

8

employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert the rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302(c). *See also id.* at § 825.301(b) ("An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice," but the employee "must explain the reasons for the needed leave so as to allow the employer to determine whether the leave qualifies under the Act.") So long as an eligible employee provides her employer with the requisite notice, the FMLA makes it "unlawful" for the employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" the employee's right to leave under the FMLA, 29 U.S.C. § 2615(a)(1), or to retaliate against the employee because she engaged in activity protected by the statute, *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219-220 (7th Cir. 2015). Mabins alleges that Defendant both interfered with her FMLA rights and retaliated against her for exercising those rights.

In analyzing those claims, the parties focus on the question of whether Marilyn Mabins provided sufficient notice to trigger Defendant's obligations under the FMLA. Defendant claims that "there is no evidence that Plaintiff ever told Defendant that her grandmother was suffering from a serious health condition." (Def.'s Resp. to Pl.'s Mot. for Summ. J. (hereafter "Def.'s Resp. Br.") [77], at 2.) But that's not quite true. Mabins testified that she told Maria Owens—Defendant's Human Resources Manager—about her grandmother's illness in January 2016, the month before Mabins requested leave, when Owens gave Mabins a ride home from work. (Mabins Dep. 84.) It is not clear from the record what Owens remembers about this conversation, but Defendant does not deny that it occurred or that Mabins mentioned her grandmother's illness. (*See* Def.'s Answer to PSAMF [86], at ¶¶ 29-31.) When Mabins called Defendant on February 21, moreover, she explained that she needed leave because she was "tending to [her] grandmother." (Mabins Dep. 56-57.) The phrase "tending to [a person]"

9

implies that the person being tended to is likely ill or incapacitated in some way. This is enough to create a genuine dispute about whether Defendant knew of Mabins' grandmother's illness.

Defendant has a better argument that Mabins never told Defendant about her grandmother's in-loco-parentis relationship to Mabins. Indeed, Mabins has expressly denied telling anyone at Defendant that her grandmother was "like a mother" to her. (Mabins Dep. 63.) Mabins' FMLA claim would be stronger if she had told Defendant her grandmother raised her. But Mabins' omission is not necessarily fatal to her case. Grandparents frequently act as parents to their grandchildren, and an employee need only give her employer "enough information to establish probable cause, as it were, to believe that [s]he is entitled to FMLA leave. That is enough to trigger the employer's duty to request such additional information . . . as may be necessary to confirm the employee's entitlement." *Aubuchon v. Knauf Fiberglass GmbH,* 359 F.3d 950, 953 (7th Cir. 2004).

Defendant analogizes this case to *Sherrod v. Phila. Gas Works*, 57 F. App'x 68 (3d Cir. 2003). In that case, a plaintiff requested FMLA leave "in order to care for her grandmother." *Id.* at 71. Her employer initially denied this request, but reversed course and granted it three days later, after the plaintiff "clarified that her grandmother had raised her." *Id.* at 72. When the plaintiff returned from her leave, she told her employer that she was not interested in working in her old position, which was supervised by an individual whom the plaintiff alleged had contributed to a racially hostile work environment. *See Sherrod v. Phila. Gas Works*, 209 F. Supp. 2d 443, 447-48 (E.D. Pa. 2002). Her employer responded by reassigning the plaintiff to a new position with comparable work hours and salary, but the plaintiff subsequently resigned because she was dissatisfied with the "duplicative" work this new position required. *Id.* at 448. The district court granted summary judgment for the plaintiff's employer on the claim that it had constructively discharged the plaintiff because of her FMLA-protected conduct. *Id.* at 454. On appeal, the plaintiff argued that her employer interfered with her FMLA rights by *initially* denying her request for leave, rather than by retaliating against her for taking the leave it had approved.

The Third Circuit rejected this argument and affirmed summary judgment for her employer, reasoning that "[s]ince appellant did not initially tell her employer that her grandmother had raised her, she failed to sufficiently explain her reasons for the needed leave so as to allow the employer to determine that her request was covered by the FMLA." *Sherrod*, 57 F. App'x at 72-73.

An unpublished decision by the Third Circuit is not binding on this court, but *Sherrod* is distinguishable from this case regardless. In *Sherrod*, the defendant explicitly told the plaintiff that she "could not use FMLA leave to care for a grandparent." *Id.* at 71. In doing so, the defendant effectively prompted the plaintiff to provide further information about her relationship to her grandmother. The plaintiff responded by explaining that her grandmother had raised her, and her request for leave was subsequently approved. Here, by contrast, there is no evidence that Defendant made any effort to explain to Plaintiff that FMLA would only protect her right to take leave to care for her grandmother if her grandmother acted as a parent to Plaintiff.

It is true, as Defendant notes, that an employer is not obligated to investigate the eligibility of *every* employee who merely demands leave. The Seventh Circuit has explained that "if such a position were accepted the consequence would be to place a substantial and largely wasted investigative burden on employers." *Aubuchon*, 359 F.3d at 953. Employees, moreover, "should not be encouraged to mousetrap their employers by requesting FMLA leave on patently insufficient grounds and then after the leave is denied obtaining a doctor's note that indicates that sufficient grounds existed, even though they were never communicated to the employer." *Id.* But there is no evidence in this case that Plaintiff deliberately set a "mousetrap" for her employer in an attempt to bait it into violating FMLA. And Plaintiff did not demand leave with no explanation—she said that she needed leave because she was "tending to" her grandmother. Requiring Defendant to seek clarification in circumstances like this would impose an insubstantial burden—all Defendant had to do was ask Mabins, during either of its

11

subsequent telephone conversations with her on February 21 and February 28, about the nature of her relationship with her grandmother.

A reasonable jury could infer from the e-mails written by Defendant's human resources staff between February 23 and March 2, 2016, that Defendant suspected Mabins was eligible for FMLA leave. But Defendant never asked Mabins to clarify her request for leave, even though it spoke with Mabins twice after she explained that she was "tending to [her] grandmother." Rather than asking about this relationship, or explaining to Mabins that FMLA does not ordinarily protect an employee's right to take leave to care for a grandparent (as the defendant in *Sherrod* did), Defendant's human resources employees asked Mabins only when she would be returning to work. The FMLA does not permit employers—who are classic "repeat-players" with superior knowledge of the law and incentives to seek favorable interpretations of the law through litigation—to make no effort to learn about an employee's potential eligibility for leave. Once an employee "place[s] [her] employer on notice of a probable basis for FMLA leave," her employer is obligated to seek out additional information that will confirm the employee's entitlement (or lack thereof). *Aubuchon*, 359 F.3d at 953. Because there are genuine disputes in this case as to whether Plaintiff triggered Defendant's obligation to investigate her eligibility for leave under FMLA, the parties' cross-motions for summary judgment are denied with regard to the merits of Plaintiff's claims.

## II. After-acquired evidence

Even if Plaintiff's substantive claims survive, Defendant asks for summary partial summary judgment limiting any damage award. Defendant contends that the after-acquired evidence rule precludes Plaintiff from recovering lost wages beyond February 9, 2017. (Def.'s Mot. for Summ. J. 8.) Plaintiff concedes that on that date, she objected to the relevance of (and refused to answer) one of Defendant's interrogatories, which asked for "the date and location of your grandfather's funeral for which you requested bereavement leave." (Pl.'s Resp. to DSOF ¶ 42.) Plaintiff also concedes that on June 8, 2017, at her deposition, she admitted that she

falsely told Defendant that she needed leave for her grandfather's funeral because she "was trying to figure out a way to get off work" and didn't think that Defendant would grant her leave for "my grandmother's brother." (Mabins Dep. 25-26, 52-54; Pl.'s Resp. to DSOF ¶¶ 43-44.) Plaintiff argues, however, that Defendant has not presented sufficient evidence that it actually would have fired her for lying about her grandfather's funeral. (Pl.'s Resp. Br. 13-14.)

"Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of discharge." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63 (1995). The Seventh Circuit has advised that this "inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say that they will discharge employees for certain misconduct while in practice they do not." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1048 (7th Cir. 1999) (quoting *O'Day v. McDonnell Douglas Helicopter Corp.*, 79 F.3d 756, 759 (9th Cir. 1996)). This does not mean, however, that an employer must show that it has, in fact, previously disciplined or terminated an employee for the same misconduct on which it now rests its after-acquired evidence defense. *See Cuff. v. Trans States Holdings, Inc.*, 768 F.3d 605, 609 (7th Cir. 2014) (rejecting conclusion that evidence of employee's misconduct would be inadmissible "unless [the defendant] could show that they had fired another worker for doing exactly what they belatedly learned" about the plaintiff).

To meet its burden in this case, Defendant presents the testimony of Tina Durr, Defendant's Director of Human Resources, who swears in an affidavit that she "would have terminated Plaintiff's employment had [Durr] known Plaintiff lied about her grandfather's death to obtain paid bereavement leave." (DSOF ¶ 46; Durr Aff. ¶ 13.) According to Durr, she considers

13

Plaintiff's conduct "a form of theft," and therefore a violation Defendant's "Work Rules."[8] (*Id.*) Durr also says that Defendant "has terminated other employees for similar dishonest behavior." (Durr Aff. ¶ 14.) The only example she cites, however, involved an employee whom Defendant "terminated . . . after discovering that she cashed the same check twice." (Durr Aff. ¶ 14.)

This evidence is too thin to support summary judgment on the after-acquired evidence defense. Notably, during discovery in this case, when Plaintiff asked Defendant to "identify each and every employee terminated for dishonesty," Defendant objected, calling the request "overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence." (Def.'s Answer to PSAMF ¶ 38.) Plaintiff's request for information about persons Defendant previously terminated for dishonesty was directly relevant to Defendant's after-acquired evidence defense. Although the court recognizes that Defendant need not, as a matter of law, show that it has previously terminated an employee for the precise misconduct now at issue, *see Cuff*, 768 F.3d at 609, the absence of such evidence is one factor a jury may consider when deciding whether Plaintiff "in fact would have been terminated" for her actions, *McKennon*, 513 U.S. at 362-63. Defendant's refusal to respond in good faith to Plaintiff's interrogatory is sufficient to preclude summary judgment on its after-acquired evidence defense. *See* FED. R. CIV. P. 56(d).

## II. Sanctions

UGN has moved for sanctions against Plaintiff and her counsel under Rule 11 of the Federal Rules of Civil Procedure. Under Rule 11, a party who files any pleading in this court certifies, *inter alia*, that "the claims, defenses, and other legal contentions" in the pleading "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." FED. R. CIV. P. 11(b)(2). The party also certifies that

---

[8] These work rules provide a list of "some, but not all" of the "types of misconduct which may lead to disciplinary action, up to and including immediate termination." One such category of misconduct is described as follows: "[t]heft or inappropriate removal from UGN premises or unauthorized possession of UGN property or property of a fellow Team Member." (D000282, Ex. C to Durr Aff.)

14

her "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *Id.* at 11(b)(3). Rule 11 permits a court to impose sanctions on a party who violates the rule, provided that party is given notice and an opportunity to respond. *Id.* at 11(c)(1).

UGN first argues that Plaintiff violated Rule 11(b) by filing her complaint before verifying that UGN was Plaintiff's employer at the time of the alleged violations of her FMLA rights. According to UGN, "Plaintiff knew that UGN sold the facility [where Mabins worked] to Applied Acoustics, effective February 3, 2016," because UGN's president sent a letter to the company's employees informing them of the sale, because Plaintiff's "pay stubs indicat[e] the change in employer," and because "[a]ny internet search would have revealed multiple articles describing the sale." (UGN Mot. for Sanctions 8.) But UGN ignores the fact that multiple firms may, in certain circumstances, be considered "joint employers" for purposes of the FMLA. *See, e.g.*, *Cuff*, 768 F.3d at 608. None of the information in the sources UGN cites[9] foreclosed the possibility of an ongoing joint employer relationship in Plaintiff's case, and UGN has not provided any evidence that Plaintiff named both UGN and AEP as defendants for an improper purpose, such as harassment.

UGN next argues that Plaintiff violated Rule 11 by waiting to voluntarily dismiss her claims against UGN until January 12, 2017, after UGN filed a motion to dismiss under Rule 12(b). According to UGN, Plaintiff was obligated by Rule 11(c)(2) to dismiss these claims within 21 days of December 14, 2016, when her counsel received a letter from UGN explaining that UGN was not Plaintiff's employer at the time of the alleged FMLA violations. But Rule 11(c)(2) does not impose any independent duty on Plaintiff to withdraw her claims against UGN within a designated time period. Rather, it imposes a duty *on UGN* to provide Plaintiff with 21-days' notice before filing its motion for sanctions with the court, thereby giving Plaintiff a "safe harbor" to withdraw the allegedly offending pleading without the court even considering UGN's motion

---

[9] UGN did not include copies of Plaintiff's pay stubs with its motion or specify what those stubs show about the identity of Plaintiff's employer.

for sanctions. *See Matrix IV, Inc. v. Am' Nat. Bank and Trust Co. of Chicago*, 649 F.3d 539, 552 (7th Cir. 2011). The fact that Plaintiff did not withdraw her claims against UGN within 21 days of receiving UGN's Rule 11(c) notice means that UGN is entitled to "a decision on the merits" of the motion for sanctions, *Nisenbaum v. Milwaukee Cty.*, 333 F.3d 804, 808 (7th Cir. 2003), not that UGN is entitled to a decision *in its favor* on the motion for sanctions.

As the court has already explained, Plaintiff did not violate Rule 11 merely by naming as a defendant an entity that her counsel reasonably believed was liable for the alleged misconduct at issue in this case. She made a risky decision by voluntarily dismissing her claims against UGN 29 days after receiving UGN's Rule 11(c) notice, rather than within the 21-day safe harbor, because in doing so she forfeited the opportunity to avoid the court's *consideration* of UGN's motion for sanctions. But she did not engage in any independently sanctionable conduct by waiting eight days beyond the end of the safe-harbor period. UGN's motion for sanctions is denied.

## **CONCLUSION**

The parties' cross-motions for summary judgment [67, 71] are denied because genuine disputes remain about whether Plaintiff provided the requisite notice of her eligibility for FMLA leave and whether Plaintiff's misrepresentations about her absence were sufficient to support discharge. UGN's motion for sanctions [43] is denied because Plaintiff did not present frivolous claims against UGN, and because there is no evidence that she presented her non-frivolous claims for an improper purpose. The parties are encouraged to discuss settlement.

ENTER:

Dated: March 20, 2018

_____
REBECCA R. PALLMEYER
United States District Judge